**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HEALIX INFUSION THERAPY, INC. and HEALIX, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-17-357 |
| HEALIX, INC. and THE INTERPUBLIC GROUP OF COMPANIES INC., | § § § | |
| Defendants. | § § | |

## MEMORANDUM AND ORDER ON THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Two companies call themselves Healix. At first glance, the companies appear to be so different in what they sell as to make confusion between them unlikely. One company, the Plaintiff Healix, was the first to use "Healix" as a tradename. The Plaintiff Healix owns and operates medical infusion clinics. The other company, the Defendant Healix, designs advertising campaigns and strategies and purchases media time and space for advertising, primarily for large pharmaceutical companies. The Defendant Healix moves for summary judgment that given these differences, there is no likelihood of confusion as a matter of law, and therefore no infringement.

Not so fast, says the Plaintiff Healix. On closer look, the two Healix entities—and we have the prior claim, says the Plaintiff—sell similar services to some of the same clients and target some of the same potential future clients. One segment of the Plaintiff Healix's business overlaps with the Defendant Healix's business. That segment provides marketing and data analytics, primarily to the pharmaceutical companies from which the Plaintiff Healix purchases infusion drugs. In this area of overlap, the Plaintiff Healix asserts, there is evidence that having the same name makes confusion likely. The Plaintiff Healix cross-moves for summary judgment on that basis.

Counsel presented oral argument on the cross-motions for summary judgment, (Docket Entry Nos. 72, 73), the responses, (Docket Entry Nos. 77, 78), and the replies, (Docket Entry Nos. 80, 81). After careful review, the court concludes that neither motion is properly granted. The parties dispute whether the two Healixes sell any, or enough, of the same type of services to support a finding of likely confusion, and whether they operate in the same markets. The parties disagree on the extent to which their services, business, and clients overlap, and whether the overlap is enough to create a likelihood of confusion. Some of the factual evidence on these issues is disputed or gives rise to conflicting inferences. These disputes and conflicts preclude granting either cross-motion for summary judgment, as explained in detail below.

## I.    Background

Healix Infusion Therapy, LLC and Healix, LLC ("the Plaintiff Healix") asserts four claims against Healix, Inc. and the Interpublic Group of Companies Inc. ("the Defendant Healix"): (1) federal trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114; (2) Texas common-law trademark and tradename infringement; (3) unfair competition and false designation of origin, in violation of 15 U.S.C. § 1125(a); and (4) Texas common-law unfair competition. The Plaintiff Healix asks the court to permanently enjoin the Defendant Healix's continued use of the name.

### A.    The Plaintiff Healix

The Plaintiff Healix was founded in Texas and began doing business in 1989 as a healthcare services company. Its services are primarily infusion therapy, operating clinics and providing services to administer intravenous drugs. The Plaintiff Healix works with hospitals, clinics, nurses, and doctors to provide infusion therapy. Over time, the Plaintiff Healix has expanded its services

into other areas of the healthcare and pharmaceutical industries, by adding in-home healthcare treatment services and marketing services.

The Plaintiff Healix developed its "CORIS" infusion-center program in 1995 to allow doctors to infuse patients directly. CORIS is an integrated program through which the Plaintiff Healix hires, trains, and places pharmacists, nurses, and administrators to handle day-to-day operations necessary or helpful for healthcare providers in administering infusion therapies. The Plaintiff Healix also owns and operates a licensed pharmacy to make and sell "compounded sterile preparations"—drug combinations targeted to specific patient needs—that it distributes in 37 states.

In 2007, the Plaintiff Healix expanded again to offer marketing, data-analytics, market-access, and supply-chain design services to pharmaceutical companies. This is the area the Plaintiff Healix asserts overlaps with the services the Defendant Healix markets and provides to the same type of pharmaceutical-company clients, including some of the same large clients. The Plaintiff Healix's customers for marketing, data analytics, and market access are many of the same large pharmaceutical companies the Defendant has as clients, including Merck, Johnson & Johnson, Shire, Biogen, and Teva.

Since 2007, the Plaintiff Healix has worked with pharmaceutical companies, primarily those from which it already purchased drugs, to: (1) help these companies market new drugs; (2) create educational or informational literature for doctors to use when they administer the drugs; (3) advertise the drugs in emails to healthcare providers; (4) "provid[e] clinical and outcomes data to assist pharmaceutical companies in improving patients' health"; (5) "creat[e] marketing collateral"; (6) give pharmaceutical companies sales information about the drugs used in Healix's infusion centers and sold in its pharmacies; (7) gather data for use in research papers, studies, and posters

featuring specific drugs; and (8) give presentations about certain drugs at medical conferences. (Docket Entry No. 72-1 at 10–11). The Plaintiff Healix also participates in clinical-trial research and drug studies. Finally, the Plaintiff Healix has contracted with a company called Outcome Health to provide digital advertising aimed at both patients and doctors, primarily through digital screens placed in the Plaintiff's own infusion centers. The Plaintiff Healix highlights its strong direct working relationships with healthcare providers and the reputation it has built as a trustworthy service provider. These relationships often result in co-branded marketing materials.

As part of its business, the Plaintiff Healix operates a website (healix.net), as well as pages on Twitter, Facebook, and LinkedIn. The Plaintiff Healix regularly sends representatives to conferences and trade shows throughout the country, and also markets through word-of-mouth, referrals, in-person meetings and presentations, direct mail, and publishing articles. The Plaintiff Healix's sales have exceeded $100 million per year since 2012 and it has spent over a million dollars on advertising in the last five years, but it does not break down its advertising expenditures or its sales revenue to separate how much is advertising for, or revenues from, marketing and data-analytic services.

The Plaintiff Healix owns several different federal registrations at the U.S. Patent and Trademark Office. All include the word "Healix." All were applied for and registered before October 2016, when the Defendant Healix began doing business. The Plaintiff Healix has aggressively enforced its trademark rights in the past.

### B. The Defendant Healix

IPG is a publicly traded company on the New York Stock Exchange, advertised as "a premier global advertising and marketing services" company. (Docket Entry No. 74-4 at 5). It is a parent

holding company for many advertising agencies, media agencies, and public-relations firms.[1]

Mediabrands Health is part of "the global media arm of IPG" and offers "media planning and buying

services" to pharmaceutical companies. (Docket Entry No. 72-1 at 13). In 2016, the Mediabrands

Health President, Jeffrey Erb, was assigned the job of creating a new name for that part of IPG. In

August 2016, Erb chose "Healix" as the new name, and IPG Mediabrands approved it. In October

2016, IPG publicly announced the new branding of "Healix, a new global division focused on Life

Science and Healthcare brands," registered the website (healixglobal.com), and began to promote

"Healix" as one of its agencies. (Docket Entry No. 72 at 13).

The Defendant Healix describes itself as "an agency providing media planning and media

buying services." (Docket Entry No. 73 at 7). The Defendant Healix purchases advertising time

or space for its clients on television, online, and in print, and works in more than 100 global markets

to deliver media services in over 200 countries. The Defendant Healix has offices in New York,

New Jersey, and London.

The Defendant Healix does not create advertising content. Instead, a company hires the

Defendant Healix once it has an ad to be placed, and the Defendant Healix will place that ad with

a media outlet. The Defendant Healix provides "media planning" and strategy services to determine

which media outlets will best reach the targeted audience. The Defendant Healix relies on its

employees' expertise and "its highly sophisticated proprietary data analytical tools" to create media

strategies for clients. (Docket Entry No. 73 at 8). On the "media buying" side of its business, the

Defendant Healix acts as an agent to negotiate and purchase large amounts of advertising time and

---

[1] According to the Defendant Healix, IPG does not provide any of its own services, nor use the Healix mark. It provides only "back office" services, such as legal and financial services for its subsidiaries.

space for its clients. The Defendant Healix "leverages more than $34 billion" in advertising annually, allowing it to purchase media time and distribution channels at a low price. (*Id.* at 9). Both creating media strategies and negotiating the purchase of media time and outlets require "highly sophisticated technology and dedicated teams of media experts." (*Id.*). The Defendant Healix uses a program called "MAGNA" to track and predict media value, and the company has a "programmatic trading desk" for "instantaneous placement online." (*Id.*). Before a company hires the Defendant Healix, it will submit a detailed "request for proposal" explaining its goals and target audience. The client completes an "exhaustive vetting process" to determine that the Defendant Healix is the proper media agency for its needs. (*Id.* at 10). After the request-for-proposal stage, a prospective client will invite media agencies to give in-person presentations before choosing which one to hire.

Both Healix entities have Merck, Shire, and Teva as clients. Pharmaceutical companies sell the Plaintiff Healix specific drugs for it to administer, and some also retain it to provide marketing and data-analytic services for the drugs used for infusion. The pharmaceutical companies retain the Defendant Healix for media-planning and media-buying services, which the Defendant Healix provides for multiple drug brands within each company.

### C.     The Allegedly Infringing Activity

It is undisputed that the Plaintiff Healix's primary healthcare and pharmaceutical-related services do not overlap with the services offered by the Defendant Healix. The issue is whether there is overlap on the marketing side, and whether that overlap creates factual disputes material to determining the likelihood of confusion.

According to the Defendant Healix, the two companies do not provide any of the same

services.  The Plaintiff Healix provides and oversees medical services; the Defendant Healix is a media agency.  The Defendant Healix argues that the Plaintiff Healix could not provide the services that the Defendant provides, and would not know what to do if it received a "request for proposal."

The Defendant Healix emphasizes that the Plaintiff's primary services are delivering infusion therapy and buying and selling drugs.  The Plaintiff Healix's website describes two primary divisions: (1) management services for physicians' practices; and (2) pharmacy operations.  As part of a third, less-prominent division called "Vendor Relations," the Plaintiff Healix "details"—educates—clinic staff on the differences among the drugs they administer.  The Plaintiff Healix creates its own materials or uses materials the pharmaceutical companies provide to promote the use of the pharmaceutical companies' drugs in the Plaintiff Healix's infusion centers.

The Defendant Healix argues that these services are "buried" in the "Vendor Relations" section of the Plaintiff's website because they are secondary services that the Plaintiff provides only as part of its preexisting relationship with the pharmaceutical companies from which the Plaintiff Healix buys the drugs that it uses in its clinics. (Docket Entry No. 73-3 at 30).  These services, part of Vendor Relations, include collecting data to help pharmaceutical companies track the use of their drugs in the Plaintiff's infusion centers.  The Vendor Relations services also include "Pharmaceutical Strategy Development" services, covering market-access, supply-chain design, data analytics, and site development.  (*Id.*).  "Market access and supply-chain design" services help pharmaceutical companies distribute newly launched drugs to infusion patients.  The design work covers logistics, pricing, insurance reimbursement, and supply issues.  The design work can include the Plaintiff Healix opening new infusion centers specifically to provide a newly launched drug.  The Plaintiff Healix also collects data on patients' drug use to provide to the drug manufacturers,

and promotes the drugs for use at its own infusion centers by advertising to both patients and healthcare providers.

The Defendant Healix disputes the Plaintiff Healix's use of the term "marketing" to describe its services. The Defendant Healix points out that the Plaintiff is not a disinterested "marketer" working on behalf of a pharmaceutical company. Instead, the Plaintiff Healix is itself an important link in the service- and drug-delivery chain, because it is a direct purchaser of the drugs from the pharmaceutical companies and directly profits from patients whose healthcare providers send them to the Plaintiff's clinics for these drugs. The Defendant Healix argues that the "marketing" services are only a small part of the Plaintiff Healix's overall services, too small to create customer confusion over the tradename. The Defendant Healix emphasizes that unlike the Plaintiff Healix, it provides no medical services or drugs.

The Plaintiff Healix maintains that it provides significant marketing services to pharmaceutical companies, including companies the Defendant serves or wants to serve as clients for its media services. The Plaintiff Healix's website states, under the heading "Pharmaceutical Strategy Development," the following:

> With 28 years of experience in targeted physician market access, Healix can assist you in understanding the dynamic needs of the healthcare providers and their patients. Our unique position opens valuable channel communication between you and physician providers, enabling you to drive critical market share and securing your intravenous and injectable product success. From strategic supply chain design and data analysis to on-going support services, we can assist you with each step of the pharmaceutical launch and utilization process. You have spent endless time and money investing in your new product. Now, let us help you identify a competitive market plan.

(Docket Entry No. 73-3 at 31–32).

The Defendant Healix uses two tools: "DNA," a data-analytics tool, and "AMP," an audience-management platform, to evaluate and understand consumer behavior to help pharmaceutical companies reach healthcare providers and patients through advertising. The Plaintiff Healix emphasizes that the Defendant Healix's strategy recommendations and data analytics impact the content of the advertising campaigns, and that the Defendant Healix collaborates directly with pharmaceutical companies' creative agencies in creating and executing these campaigns. The Defendant Healix has also contracted with Outcome Health—called ContextMedia Health at the time—to purchase advertising space in doctors' offices for pharmaceutical company clients to advertise to both patients and healthcare providers. (Docket Entry No. 74-16).

Both parties advertise through websites and social media, through written articles in healthcare publications, and at pharmaceutical advertising and media conferences. Both parties have been featured in the pharmaceutical industry trade publication "FiercePharma."

The primary issue is whether, given some shared services and clients within two companies that otherwise offer different services in the healthcare industry—running infusion centers as opposed to providing media services—there are genuine factual disputes or conflicting inferences material to determining a likelihood of confusion and related issues.

## II.     The Legal Standards

### A.     The Summary Judgment Standard

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); *see also* FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 Fed. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 Fed. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Par. Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600

F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 Fed. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

### B. Trademark Infringement and Unfair Competition

Section 32 of the Lanham Act provides a cause of action for infringement when, without the registrant's consent, one uses "in commerce, any reproduction, counterfeit, copy[,] or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive. . . ." 15 U.S.C. § 1114(1)(a). "A trademark or service mark is 'any word, name, symbol, or device or combination thereof' used by a person to 'identify and distinguish his or her goods [or services], including a unique product [or service],' from the goods or services of another and 'to indicate the source of the goods [or services], even if that source is unknown.'" *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998) (quoting 15 U.S.C. § 1127). To prove infringement, a plaintiff must show that it owns a legally protectable mark and that there is a likelihood of confusion between that mark and the defendants' allegedly infringing material. *Am. Rice Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008). The defendant bears the burden in challenging a registered mark's validity. *Pebble Beach Co. v.*

*Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1537 (S.D. Tex. 1996).

The Fifth Circuit assesses the likelihood of confusion based on the following "digits of confusion": "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendants' intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice*, 518 F.3d at 329 (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)). The court must assess and weigh each digit to determine whether there is a likelihood of confusion. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)). "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (citing *Bd. of Supervisors La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478). "The determination of a likelihood of confusion under federal law is the same as the determination of a likelihood of confusion under Texas law for a trademark infringement claim," *Elvis Presley Enters.*, 141 F.3d at 193, for unfair competition, *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 711 (S.D. Tex. 2009), and for false designation, *Philip Morris USA, Inc. v. Lee*, 547 F. Supp. 2d 667, 674 (W.D. Tex. 2008).

Although likelihood of confusion is generally a fact question, *Elvis Presley Enters.*, 141 F.3d at 196, summary judgment may be proper if the undisputed facts in the "summary judgment record compel[] the conclusion that the movant is entitled to judgment as a matter of law." *Smack*

*Apparel*, 550 F.3d at 474 (citing *Beef/Eater Rests., Inc. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968)). The question of likelihood of confusion requires the court to consider "the typical buyer exercising ordinary caution." *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 534 (5th Cir. 2012).

## III. Analysis

### A. A Legally Protectable Mark

"In order to be registered [and thus legally protectable], a mark must be capable of distinguishing the applicant's goods from those of others." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing 15 U.S.C. § 1052). "To be protectable, a mark must be distinctive . . . ." *Am. Rice*, 518 F.3d at 329.

"Registration of a mark with the PTO constitutes prima facie evidence of the mark's validity and the registrant's exclusive right to use the registered mark in commerce with respect to the specified goods or services." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (citations omitted). "This presumption of validity may be rebutted by establishing that the mark is not inherently distinctive." *Id.* But a "mark need not be registered in order to obtain protection, because '[o]wnership of trademarks is established by use, not by registration.'" *Smack Apparel*, 550 F.3d at 475 (quoting *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842 (5th Cir. 1990)).

The right to a trademark may also stem from the first use of that mark in connection with goods. *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975). "The protectibility of unregistered marks is governed generally by the same principles that qualify a mark for registration under the Lanham Act." *Smack Apparel*, 550 F.3d at 475. "The key is whether the mark

is 'capable of distinguishing the applicant's goods from those of others.'" *Id.* (quoting *Two Pesos*, 550 U.S. 768). "Marks are generally classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Id.*

The Plaintiff Healix points to two different reasons that it has prior, valid rights to the "Healix" mark. First, the Plaintiff Healix owns 12 different "Healix" registrations with the U.S. Patent Office. (Docket Entry No. 75-1 at 2). The earliest was in 1999; the most recent from September 2016. The Defendant Healix does not appear to challenge the presumption of validity that the registration creates. Second, the Plaintiff Healix began using the "Healix" name in 1989, ten years before registering the mark, long before the Defendant Healix's first use.

The Defendant Healix has the burden of rebutting the *prima facie* case by showing a lack of distinctiveness. Distinctiveness can be inherent or acquired. *Id.* (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000)). A generic term is not a legally protectable trademark. Thomas McCarthy, Trademarks and Unfair Competition § 11:2 (5th ed. 2018). An inherently distinctive mark creates an automatic presumption that the mark is valid. *Id.* Defining a mark's inherent or acquired distinctiveness requires analyzing whether the mark is generic, descriptive, suggestive, arbitrary, or fanciful. *Amazing Spaces*, 608 F.3d at 241. "A mark's placement on this spectrum determines whether and how it is entitled to legal protection. Marks that are suggestive, arbitrary, or fanciful, 'because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection.'" *Amazing Spaces*, 608 F.3d at 241 (quoting *Two Pesos*, 505 U.S. at 768). This analytical framework is known as the *Abercrombie* test, based on a Second Circuit opinion later approved by the Supreme Court in *Two Pesos*. The test applies "only in the context of marks consisting of words." *Amazing Spaces*,

608 F.3d at 240 (citing *Wal-Mart*, 529 U.S. at 210); *see also* MCCARTHY § 11:2 ("The spectrum of descriptive, suggestive, arbitrary and fanciful was created to categorize word marks. It is not suitable for non-word designations . . . ."). Because the mark at issue is the word "Healix," the *Abercrombie* test applies.

The Plaintiff Healix argues that the word "Healix" has no meaning and is arbitrary and fanciful, making it inherently distinctive and protectable. Arbitrary or fanciful marks "bear no relationship to the product or service." *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1154 (S.D. Tex. 1982). "Fanciful marks consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark. Such marks comprise words which are either totally unknown in the language or are completely out of common usage at the time." *Id.* (quoting MCCARTHY, § 11:3). "Unlike fanciful marks, arbitrary marks are composed of words 'which are in common linguistic use but which, when used with the goods or services, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services.'" *Id.* (quoting MCCARTHY, § 11:3).

The Defendant Healix argues that the "Healix" marks are "suggestive" of healing or health. "A word mark which suggests, but does not directly and immediately describe, some aspect of the goods or services is put into the 'suggestive' category." MCCARTHY § 11:62. The Fifth Circuit uses the "imagination test" to distinguish between descriptive and suggestive marks. This test "seeks to measure the relationship between the actual words of the mark and the product to which they are applied." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 452 (5th Cir. 2017). The test is whether the word requires imagination to make the connection to the good or service offered. "Penguin" as a refrigerator brand and "Coppertone" for sun tanning lotion are both

examples of suggestive marks. *Id.*

The word "Healix" has no defined meaning. "Healix" appears to be a word invented for the mark and bears scant relationship to the products or services the parties offers. At most, it is vaguely similar to "helix," a spiral shape made famous by the term "double helix" to refer to the DNA molecular structure, or vaguely evocative of something medical or biological. Whether fanciful or suggestive, "Healix" is "inherently distinctive" and therefore "given legal protection immediately upon first use as a mark." MCCARTHY § 11:4.

The Plaintiff Healix has shown that it has a legally protectable mark, by registration starting in 1999 and by usage before that.

**B.     The Likelihood of Confusion**

**1.     The Strength of the Plaintiff's Mark**

The strength of a senior user's mark strength is measured by "its capacity to indicate the source of the goods or services with which it is used." *RaceTrac Petroleum v. J.J.'s Fast Stop*, 2003 U.S. Dist. LEXIS 1569, at *15–16 (N.D. Tex. Feb. 3, 2003) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. i (1995); *Quantum Fitness Corp. v. Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 818–819 (S.D. Tex. 1999)). "The stronger the mark, the greater the protection it receives . . . ." *Elvis Presley Enters.*, 141 F.3d at 201. A trademark's strength is determined by its classification and the degree to which it is recognized in the marketplace. *Am. Rice,* 518 F.3d at 330; *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981). Marks are stronger and have more protection "as one moves away from generic and descriptive marks toward arbitrary marks." *Am. Rice,* 518 F.3d at 330 (quoting *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc*., 725 F.2d 336, 346 (5th Cir. 1984)).

As discussed above, "Healix" is a fanciful or suggestive mark because it is an invented word with no dictionary definition, and it is at most vaguely suggestive of healing or health. This weighs in favor of finding it to be a strong mark.

The parties dispute whether the Plaintiff Healix's registration affects the mark's strength. The Plaintiff argues that the incontestable status of its mark is another factor showing that it is a strong mark. The plaintiff cites *U.S. Risk Ins. Grp., Inc. v. U.S. Risk Mgmt., LLC*, No. 3-11-cv-2843-M-BN, 2013 U.S. Dist. LEXIS 118602, at *22 (N.D. Tex. July 16, 2013) ("Defendant is mistaken that Plaintiff cannot assert the incontestable nature of its mark as evidence of its strength . . . . Moreover, the Fifth Circuit has recognized that a mark's status as incontestable can be considered when determining the strength of the mark.") (citing *Am. Rice*, 518 F.3d at 331). The Defendant Healix argues that incontestable status cannot alone make a weak mark strong, citing *Oreck Corp*, 803 F.2d at 171.

Incontestable status relates to a mark's validity, which is only one aspect of strength. The Defendant Healix does not argue that the Plaintiff's mark is invalid or unprotectable, only that there is no likelihood of confusion. *Id.* ("U.S. Floor's argument was not that Oreck's mark was invalid, but that it was not *infringed* because there was no confusion. *Park 'N Fly* says nothing to preclude this argument.").

Marketplace recognition, the other aspect of a mark's strength, depends on "advertising, length of time in business, public recognition, and uniqueness." *Quantum Fitness*, 83 F. Supp. 2d at 820 (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988)). The Plaintiff Healix argues that its mark is well-recognized in the marketplace because the Plaintiff has been using the mark since 1989 and it covers "a broad and diversified array of services and

products." (Docket Entry No. 72-1 at 20). The Plaintiff Healix argues that it has continuously provided marketing and data-analytic services to pharmaceutical companies using the "Healix" mark since 2007. The Plaintiff Healix has enforced its trademark rights against infringers, including against other "digital healthcare advertising agenc[ies]." (Docket Entry No. 72-1 at 13).

The Defendant Healix argues that the Plaintiff's mark is weak in the relevant media-buying and media-planning markets. Instead, because the Plaintiff operates only or primarily in the medical-care marketplace, it enjoys little or no recognition in the "very separate marketplace for multi-million dollar global media services." (Docket Entry No. 73 at 23). The issue is how to define the relevant market. *See, e.g.*, *Bd. of Regents of the Univ. of Hous. Sys. v. Hous. Coll. of Law, Inc.*, 214 F. Supp. 2d 573, 586, n.45 (S.D. Tex. 2016) (citing *Quantum Fitness*, 83 F. Supp. 2d at 830) (the strength of the mark depends on the senior user's mark in the relevant marketplace); *Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 542 (5th Cir. 2015) (the relevant market for "bead dogs" is "Mardi Gras-themed products," not "pastries, clothing, or jewelry" or "bead dogs," as the parties suggested); *Amazing Spaces*, 608 F.3d at 245, n.18 (the relevant market is "self-storage services," but that does not require the court to ignore the use of the mark in other industries).

The Plaintiff Healix argues that the relevant market is the "pharmaceutical space." The two Healix entities share some large pharmaceutical companies seeking marketing services, including media-planning and buying, as clients. The Plaintiff Healix has presented evidence that it has been purchasing drugs from pharmaceutical companies for nearly 30 years. It has provided and marketed those drugs to healthcare providers in its own infusion centers, and it has also advised pharmaceutical companies on "how to best position the product in the market and effectuate good messaging" to a wider audience of healthcare providers. (Docket Entry No. 75-3 at ¶ 7). Because

of that, the Plaintiff Healix has built a strong reputation as a "service provider in the healthcare arena." (Docket Entry No. 75-3 at ¶ 12).

The Defendant Healix relies on *Brennan's, Inc. v. Brennan*, 512 F. Supp. 2d 559, 563 (S.D. Miss. 2007), to argue that its large pharmaceutical customers for multi-media campaigns and strategies are the relevant marketplace. The Plaintiff Healix argues that *Brennan's* is inapplicable because it deals with a descriptive surname, not an arbitrary mark, and it focuses on trademark rights within a certain geographic territory.

In *Brennan's*, the plaintiff, Brennan's, Inc., owner of a famous New Orleans restaurant of the same name, sued the defendants, sons of one of the co-owners of Brennan's, Inc. The issue was the defendants' use of the name "Clark and Blake Brennan's Royal B" for restaurants the defendants planned to open in Florida and Mississippi. *Id.* at 560. The court explained that "[t]he relevant market here is the pool of potential customers of defendant's Royal B restaurants, for it is those patrons whose potential confusion is at issue." *Id.* The court determined that the plaintiff's market arguably extended from New Orleans to Jackson, Mississippi and Destin, Florida. By contrast, the court in a similar case in the Second Circuit determined that the plaintiff's market did not extend as far as New York. *See Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 132 (2d Cir. 2004). In support of its conclusion that the relevant market was the defendants' customers, the Mississippi court cited the same Second Circuit case involving Brennan's. *Id.* (citing *Brennan's*, 360 F.3d at 132). That case, in turn, cited to both the Second Circuit precedent and the McCarthy's treatise sections on distinct and geographically separate markets. *Brennan's, Inc.*, 360 F.3d at 132 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir. 1959) ("Therefore if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct

and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, of the note so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark."); MCCARTHY § 26:25, *Territorial Disputes: A Race to Secondary Meaning*)).

The facts and legal analysis in *Brennan's* are different from the present case. The *Brennan's* parties operated in the same industry, but in geographically distinct areas. The parties here raise no issue about distinct geographic markets, but focus instead on whether they operate in the same industry. *Brennan's* does not stand for an overarching proposition that a defendant's customer base alone or always defines the relevant market. In addition, as the Plaintiff notes, no case in the last 11 years cites *Brennan's* as the standard for determining the relevant market.

The record evidence shows that the Defendant Healix's primary business and one part of the Plaintiff Healix's business is providing marketing and media-related services to large pharmaceutical companies. The relevant market is the media and marketing needs of the pharmaceutical industry.

Recognition is harder to measure. The Plaintiff Healix presents no evidence of its recognition, such as survey evidence, but this is not dispositive. *See Homax Prods. v. Homax, Inc.*, No. H-08-cv-01560, 2009 U.S. Dist. LEXIS 126699, at *18 (S.D. Tex. Aug. 5, 2009) (citing *Bose Corp. v. QSC Audio Props., Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002) (direct evidence of recognition is rare; it is generally measured by indirect evidence such as sales volume, advertising expenditures, and promotional activities). The record evidence shows that the Plaintiff Healix's mark is relatively strong and that the two Healix entities serve the same relevant market, but in different ways, on a different scale, and to a different extent. These differences are reflected in factual disputes in the record evidence and in conflicting inferences that evidence may support.

## 2.     Design Similarity

This factor requires the court to consider the similarity between "the marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements." *Elvis Presley Enters.*, 141 F.3d at 197. The comparison is not restricted to individual features. Instead, the court considers "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980) (citation omitted). "'The relevant inquiry is whether, under the circumstances of the use,' the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley Enters.*, 141 F.3d at 201 (quoting RESTATEMENT § 21 cmt. c).

Mark similarity is "determined by comparing the marks' appearance, sound, and meaning." *Id.* "Even if two marks are distinguishable, [the factfinder asks] whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Homax*, 2009 U.S. Dist. LEXIS 126699, at *21 (citing *Elvis Presley Enters.*, 141 F.3d at 201). "To determine the meaning and connotation of the mark, the court considers the context of use, such as labels, packaging, and advertising." *Id.*

The Plaintiff Healix argues that the two marks are "virtually identical," emphasizing the identical word, spelling, and pronunciation, and the testimony of Jeffrey Erb, the president of the Defendant Healix, that the two terms are "identical."[2] (Docket Entry No. 74-5 at 67). The Plaintiff Healix's mark uses "distinct stylization in blue or white," (Docket Entry Nos. 75-18, 75-25), while the Defendant Healix uses block letters, in blue. (Docket Entry Nos. 74-21, 74-22, 74-31), but the

---

[2] The Defendant Healix accuses the Plaintiff Healix of misrepresenting the record here. That is not accurate. The Plaintiff Healix does not argue that the Defendant Healix admits that the "marks" are identical, but only that the "terms are the same." They are, as Erb admitted in his deposition. (Docket Entry No. 74-5 at 67).

extent to which this distinguishes them is disputed.

The Defendant Healix argues that its mark combines the word "Healix" with the qualifier "an IPG Mediabrands Company" or with "Global." (Docket Entry Nos. 73-65, 73-66). The Plaintiff disputes this, arguing that the Defendant often refers to its company as "Healix" without adding "an IPG Mediabrands Company." (Docket Entry Nos. 74-10, 74-18). The exhibits that the Defendant cites show "Healix" alone as the dominant logo. "IPG Mediabrands" or "Global" is included, but separate from the "Healix" logo and in much smaller font. The "Healix" logo is the first and primary thing the viewer sees. The Defendant Healix's Twitter page similarly shows "Healix" as the dominant mark, with no qualifier. (Docket Entry No. 73-65). The Twitter page has the words "an IPG Mediabrands company," but in much smaller font, or the word "Global" in the handle ("@HealixGlobal"). (*Id.*). The Defendant's email signature is dominated by the logo "HEALIX." Above that logo, but in much smaller font, are the words "An IPG Mediabrand Company." (Docket Entry No. 73-66; *see also* Docket Entry No. 74-18, "FiercePharma" article about the Defendant Healix, with the dominant "HEALIX" logo).

The Defendant Healix argues that the commercial impression its mark creates is "plainly dissimilar" from the impression created by the Plaintiff's use of the mark. The Defendant Healix distinguishes *Quantum Fitness*, 83 F. Supp. 2d at 823. In that case, as the court explained, when the dominant portion of two marks is the same or similar, confusion is likely. Because "Quantum" was the dominant portion of the mark, confusion was likely. The Defendant Healix distinguishes *Quantum* as involving competitors offering "closely related goods and services to unsophisticated consumers," in contrast to the "wholly unrelated services and highly sophisticated customers here." (Docket Entry No. 80 at 10).

The similarity of the mark does not depend on the sophistication of the customer base, but on how the marks compare. The evidence shows that the word "Healix" dominates, and that the different letter shapes do not clearly set them apart. The facts here are stronger than in *Quantum*, in which the court found that the dominance of the word "Quantum" made "Quantum Fitness" and "Quantum Lifestyle" similar. Here, both users use only the term "Healix," generally without any conspicuous style or qualifier. Here, as in *Quantum*, the disputed word is the dominant portion of the mark, because it is the word that both users use, standing alone, and because it is a made-up word.

This factor weighs in favor of a likelihood of confusion, but again, some of the facts are disputed or give rise to conflicting inferences.

### 3.     Product and Service Similarity

"The greater the similarity between products and services, the greater the likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202. Direct competition is not required. *Id.* "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Id.* Affiliation confusion arises when "the junior user's services are in a market that is one into which the senior use would naturally expand." *Id.* (citing RESTATEMENT, § 21(e)). "Consumer perception is the controlling factor." *Id.* "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.* (quoting RESTATEMENT, § 21 cmt. j).

The Plaintiff Healix views the services that part of its company offers and that the Defendant Healix is in the business of offering as the same. The Defendant Healix views the services as

different in the context of the companies (an infusion-service-center company versus a media-services company); the nature of the services (assistance in marketing drugs purchased from pharmaceutical companies for use in the Plaintiff's own clinics and by other healthcare providers versus designing and implementing large-scale media campaigns, including buying the media time or space); and in the scale of the services (relatively limited marketing advice versus full-scale media campaign packages). The evidence shows that the services are somewhat similar, but there are factual disputes as to how similar they are. The issue is how material those disputes are to determining a likelihood of confusion.

The Plaintiff Healix argues that both companies provide pharmaceutical companies with "marketing related and data analytic services to increase a pharmaceutical product's exposure . . . ." (Docket Entry No. 72-1 at 23). The Plaintiff Healix has provided these services for 10 years. The Plaintiff Healix asserts that it provides pharmaceutical companies with "strategy development services for the launch of a pharmaceutical product," (Docket Entry No. 72-1 at 23), and that one of its main marketing strategies is in-office advertising, which it continues to expand by placing advertisements and digital displays in its infusion-therapy centers. The services the Plaintiff Healix provides include helping companies to position their products in the market, to create good brand messaging, to create handouts for educating healthcare providers, and to prepare posters, research papers, and studies. (Docket Entry No. 72-1 at 10–11). The Defendant Healix offers its clients, which include pharmaceutical companies selling to healthcare providers, "strategy recommendations regarding media for promoting their brands." (Docket Entry No. 72-1 at 23). The overlapping services the two Healix parties offer, according to the Plaintiff, include supporting new drug launches, providing data from patients to help pharmaceutical companies market their products, and

using data to identify the healthcare providers that frequently diagnose patients with specific illnesses or conditions in order to advise pharmaceutical companies where to direct their marketing efforts.

The Defendant Healix accuses the plaintiff of "rebranding" some services as "marketing" to create the appearance of overlap. The Defendant argues that the Plaintiff does not use the term "marketing" to describe its services, instead calling them "Vendor Relations." The Defendant Healix insists that the Plaintiff Healix provides only healthcare services—infusion centers and services—while the Defendant is a "global healthcare media agency," made up of "experts in healthcare," and "pharmaceutical, biotechnology, and nutraceuticals experts," "deliver[ing] a global healthcare practice with deep expertise in both HCP and Consumer disciplines, best-in-class healthcare." (Docket Entry Nos. 73-5, 73-6, 74-10).

The Defendant Healix states that it provides two services: media planning and media buying. For media planning, the Defendant Healix creates "custom media strategies" to deliver advertisements based on data about the media consumption of doctors and patients. These services, the Defendant argues, are not similar to the Plaintiff's "Vendor Relations," which do not require evaluating different media outlets or creating a mix for an advertising campaign, and do not use data showing media-consumption habits.

For media buying, the Defendant Healix "acts as an agent for pharmaceutical companies to negotiate with media outlets" to buy advertising space. (Docket Entry No. 80 at 13). These services are not related to "Vendor Relations"; an ordinarily prudent consumer would not see those services as "media buying." The Defendant emphasizes that the Plaintiff does not place advertising in a range of media outlets in a "media plan," but rather places advertisements primarily in the Plaintiff's

own infusion-therapy facilities. The Defendant argues that the Plaintiff does not negotiate for media space or time on behalf of its pharmaceutical clients. The Defendant Healix also argues that the Plaintiff Healix creates content to help pharmaceutical companies market their drugs, and the Defendant does not, demonstrating that the services are not the same.

The Plaintiff responds by arguing that it has offered marketing and data analytics since 2007. (Docket Entry No. 75-3, ¶ 6–7: Healix has "reported such data and information to pharmaceutical companies to support their marketing, sales and distribution of drugs. . . . Healix expanded its business in early 2007 by offering marketing, data analytics, market access and supply chain design services to those pharmaceutical companies from whom it purchases drugs, to improve brand awareness of products and increase sales."). The Plaintiff points to its website, which states:

> With 28 years of experience in targeted physician market access, Healix can assist you in understanding the dynamic needs of healthcare providers and their patients. Our unique position opens valuable channel communication between you and physician providers, enabling you to drive critical market share and securing your intravenous and injectable product success. From strategic supply chain design and data analysis to on-going support services, we can assist you with each step of the pharmaceutical launch and utilization process. You have spent endless time and money investing in your new product. Now, let us help you identify a competitive market plan.

(Docket Entry No. 81 at 10, citing Docket Entry No. 77-15 at 31–32) (emphasis in brief).

The Defendant Healix cites *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1080 (N.D. Cal. 2012), for the proposition that "what is relevant is the substance of the two companies' respective products and services, not the characterizations or labels offered by the parties regarding the products and services." (Docket Entry No. 77 at 12 (quoting 859 F. Supp. 2d at 1080)). This argument, however, could also cut against the Defendant; it does not matter what the Plaintiff Healix

called its services, if the substance of those services are similar to the Defendant's.

The parties differ in how specifically they define the services each provides. The Defendant Healix appears to discount the cases holding that direct competition is not required to show a likelihood of confusion. Viewed at a high level of generality, the services offered by one part of the Plaintiff Healix and by the Defendant Healix are similar. Both parties offer services to an overlapping client base of large pharmaceutical companies, to help them market and advertise their products. Viewed more closely, the services are less similar. Some specific aspects of how each Healix offers its marketing services highlight the differences. The Defendant plans and buys third-party media time and space for pharmaceutical companies, while the Plaintiff advises companies on marketing and places advertisements, both primarily in its own infusion-therapy centers. The Plaintiff provides data to pharmaceutical companies about patient drug needs or use, while the Defendant compiles and provides data on consumer media trends. *See, e.g.*, *Exxon Corp. v. Tex. Motor Exch.*, 628 F.2d 500, 505 (5th Cir. 1980) (the plaintiff and defendant were both involved in similar "car care"); *Amstar Corp.*, 615 F.2d at 261 (there was little similarity between a pizza-making company and a company manufacturing sugar, salt, mustard, ketchup, and other condiments); *Bell v. Starbucks U.S. Brand Corp.*, 389 F. Supp. 2d 766, 775 (S.D. Tex. 2005) (beer production and coffee production are similar enough to make confusion reasonable, but not automatic).

By the standards the case law provides, the services the two Healixes offer are not the same, but they appear to be similar enough to support conflicting inferences on the likelihood of confusion. The cases that find this digit to weigh in favor of finding a likelihood of confusion generally involve products or services that are nearly identical. *See, e.g.*, *Xtreme Lashes*, 576 F.3d at 234 (products

sold nearly identical); *Streamline*, 851 F.3d at 444–45 (companies that manufactured custom fabricated natural-gas processing equipment offered similar products); *RE/MAX Int'l, Inc.*, 655 F. Supp. 2d at 702 (the defendants concede that they offer identical real-estate brokerage services); *T-Mobile US, Inc. v. Aio Wireless LLC*, 991 F. Supp. 2d 888, 915 (S.D. Tex. 2014) (products and services offered by directly competing companies in the "no-annual-contract market" and targeting similar clients were similar); *Univ. of Hous. Sys.*, 214 F. Supp. 3d at 589 (the services offered by two law schools were practically identical; the defendant's attempt to distinguish itself by noting it was a standalone law school and not a full-service university did not defeat the fact that the two law schools offered very similar services). Courts find that services are dissimilar as a matter of law only if they are obviously so. *See, e.g.*, *MCW, Inc. v. Badbusinessbureau.com, LLC*, 2004 U.S. Dist. LEXIS 6678 (N.D. Tex. Apr. 19, 2004) (dismissal was proper as a matter of law because the plaintiff offered career counseling and the defendant offered a for-profit consumer complaint forum). This case does not fall at either end of the spectrum, but in the middle.

The parties dispute whether the Plaintiff Healix will "naturally expand" into the same market as the Defendant. The Plaintiff argues that it is expanding into providing a larger range of media services by placing advertisements in its own healthcare facilities. Both parties market pharmaceutical drugs. The Plaintiff Healix is expanding the marketing services it offers through its contract with Outcome Health. Outcome Health provides "digital point of care products and services" in the Plaintiff's infusion-therapy centers, aimed at "enhanc[ing] patient engagement and patient education." (Docket Entry No. 75-21). By placing digital advertisements and messaging in its infusion-therapy centers, the Plaintiff Healix is procuring media space for its pharmaceutical customers. The Plaintiff Healix also points out that the Defendant Healix has worked with

AccentHealth, the predecessor to Outcome Health, to purchase advertising space in physicians'
offices, just as the Plaintiff Healix is now doing. The Defendant Healix argues that these are not the
same services because the Plaintiff Healix is placing ads in its own centers. The Plaintiff Healix
disagrees, arguing that these locations are not only the Plaintiff's own healthcare centers, but belong
to third-party medical providers.

The Defendant Healix insists that the Plaintiff Healix "could not possibly" expand into the
same market as the Defendant. According to the Defendant Healix, it possesses expertise,
capabilities, and buying power necessary to succeed in the media-planning market, which the
Plaintiff Healix does not and cannot provide. This is another iteration of the same issue: how to
define the services the two companies provide? If, as the Defendant suggests, the services are
defined specifically as millions of dollars of media buying and selling, then the Defendant is likely
correct that the Plaintiff Healix will not convert itself into a global media agency in the reasonably
foreseeable future. If the services are defined more generally as marketing for pharmaceutical
companies, then the Plaintiff Healix has expanded and will likely continue to expand into that
industry. These conflicting arguments both find record support and weigh in favor of finding that
summary judgment is not warranted.

The services that the Defendant Healix offers and that part of the Plaintiff Healix offers have
similarities and target the same or similar customers. The record evidence is disputed or could
generate conflicting inferences as to the extent and nature of the similarities, making it improper to
grant either motion for summary judgment. *See U.S. Risk Ins.*, 2013 U.S. Dist. LEXIS 118602, at
*38 (finding material factual disputes when the services were not the same, but the parties were both
in the insurance industry and might work with the same or similar customers).

#### 4.    The Identity of Retail Outlets and Purchasers

"Differences in the parties' customer bases can lessen the likelihood of confusion." *Quantum Fitness*, 83 F. Supp. 2d at 826 (citing *Exxon Corp.*, 628 F.2d at 505–506; *Amstar Corp.*, 615 F.2d at 262; *CICCorp., Inc. v. AIMTech Corp.*, 32 F. Supp. 2d 425, 437 (S.D. Tex. 1998)).  The Plaintiff Healix argues that both parties target the same pharmaceutical companies.  The Defendant Healix argues that the Plaintiff's primary purchasers and clients are physicians and other medical-care providers, not pharmaceutical companies, so that "no overlap of consumers exists."  (Docket Entry No. 77 at 27).  The parties vigorously dispute whether they interact with any of the same individuals at those companies.  The Defendant Healix asserts that "it is undisputed that completely different parts and employees of these large, sophisticated companies interact with each party."  (Docket Entry No. 73 at 25).  The Plaintiff Healix, on the other hand, argues that the two companies do interact with some of the same individuals.

The Plaintiff cites to record evidence showing shared contacts at the pharmaceutical companies that the two Healix entities both count as clients.  The president of the Plaintiff Healix, Mark Winters, testified that "Healix's points of contact at these pharmaceutical companies for such marketing and data analytics services include: chief executive officers, presidents or those from executive leadership, brand managers, and marketing directors, among others."  (Docket Entry No. 75-3 at ¶ 13).  Attached to Winters's declaration is an agenda from a partnership meeting between the Plaintiff Healix and Teva, which shows the people that the Plaintiff Healix dealt with at Teva, including Dave Evan, a Brand Marketing Director.  (Docket Entry No. 75-28 at 2).  The Plaintiff also points to a series of emails between Winters and individuals at Teva, including Jerry Kester, the Associate Director of Trade Strategy Development; Christine Baeder, the Vice-President of

Customer Operations; Jennifer Chang, the Director of Marketing Institutional; and Jennifer King, the Director of New Product Forecasting, all of whom are involved in the marketing side of Teva. (Docket Entry No. 75-28 at 3–4). The Plaintiff then points to emails between Dave Evan, Teva's Brand Marketing Director, and the Defendant Healix, (Docket Entry No. 74-35), and a meeting agenda for a "US Brand Planning Kick-off Meeting" between the Defendant Healix and Teva employees, including Jerry Kester, a shared point of contact.

The two Healixes do have some shared contacts. These shared contacts are neither numerous nor frequent, but the record evidence contradicts the Defendant's claim that the two Healixes deal with "completely different" people at the pharmaceutical companies they both have or seek to have as clients.

The Defendant Healix attempts to minimize this evidence, arguing that the Plaintiff Healix cites to "one common individual," Dave Evan, who has corresponded by email with the Defendant, but not with the Plaintiff. (Docket Entry No. 77 at 27). The Defendant argues that Evan was "one of several attendees at a single meeting" between Teva and the Plaintiff, and that he is "indisputably not confused." (*Id.*). Whether Evan is confused is not the issue in analyzing this digit of confusion. This issue is the extent to which the customer base of the two companies overlaps. While the shared individual contacts may be few, the record does not support the Defendant Healix's argument that there is *no* evidence that the two Healixes work with any of the same individuals at the pharmaceutical companies they share as clients or potential clients.

The Defendant Healix cites one exhibit, (Docket Entry No. 73-67), for its argument that the two Healixes deal with different people at large pharmaceutical companies. The email shows a communication from a "Field Reimbursement Manager" at Teva to the Plaintiff Healix's Vice-

President of Supply Chain. The Defendant Healix does not explain what the email establishes or rebuts. The Defendant provides another email from a lawyer at Teva, a pharmaceutical company that is a client of both Healixes. The email states that the personnel who interacted with the Healix parties were from two different parts of Teva. (Docket Entry No. 73-62). The Plaintiff Healix argues that the email is taken out of context and points to the evidence, discussed above, showing that the Healix parties interacted with several of the same Teva employees, including Dave Evan and Jerry Kester. (Docket Entry Nos. 75-35, 75-28). The record evidence shows not only that the two Healixes share some of the same large pharmaceutical clients, but that, at least on occasion, the two Healixes use the same individual contacts at those pharmaceutical companies.

The Defendant Healix cites *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201 (1st Cir. 1983), for the proposition that a large and complex healthcare provider—in that case, "[t]he 'hospital community'"—was "not a homogeneous whole, but . . . composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products." *Id.* at 1207. The Plaintiff Healix responds that the defendants in that case sold blood-analyzer machines to hospital chemistry labs, but never contacted the "basically autonomous" hospital pharmacy to which the plaintiff sold its products. By contrast, the Plaintiff Healix argues, both Healix parties work with some of the same brand managers and others at the pharmaceutical companies they both serve as clients. The Plaintiff Healix also cites *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 502 (D. Del. 1998), which rejects the argument that selling to different departments of a single company is selling to different consumer markets. The *Acxiom* court focused instead on the corporate targets of the parties' sales and marketing efforts. *Id.* The *Acxiom* court considered the fact that the defendant's representatives

targeted the same corporate officials as the plaintiffs. Similarly, the Plaintiff Healix points to a marketing conference targeting pharmaceutical companies that lists the Defendant Healix's President, Jeffrey Erb, as a speaker.[3]

There is evidence showing both general overlap in the customer base, in that both Healix parties target large pharmaceutical companies, and specific overlap, in that they share several of the same major clients and have some of the same contacts. *See, e.g.*, *Quantum Fitness*, 83 F. Supp. 2d at 827 (the lack of direct overlap in customer bases was outweighed by the complementary nature of the markets both parties served); *Streamline Prod. Sys.*, 851 F.3d at 455 (the absence of overlap in the direct customer base made this digit of confusion neutral). The evidence is disputed or supports conflicting inferences about the extent to which the two Healix entities' customers overlap and the impact of this overlap on the likelihood of confusion. The Fifth Circuit has not directly addressed whether to define the "customer" by department, as the Defendant Healix suggests, or by company, as the Plaintiff Healix argues. As with the services offered, the evidence as to the customer-base similarity is factually disputed or supports conflicting inferences. Both weigh against granting summary judgment on the likelihood of confusion.

### 5. The Advertising Media

"This . . . digit of confusion considers the degree of overlap in the marketing approaches of the plaintiff and the defendant." *T-Mobile*, 991 F. Supp. 2d at 920. The companies may not advertise in identical channels, but targeting the same class of buyers can support an inference that "the parties use similar advertising and marketing channels." *Xtreme Lashes*, 576 F.3d at 229.

---

[3] It is worth noting that, despite the Defendant Healix's arguments, this brochure shows them listed only as "Healix," with no mention of "Healix Global" or "an IPG Mediabrands Company."

The Plaintiff Healix argues that it and the Defendant advertise to pharmaceutical companies through websites and social media, as well as by having speakers at conferences. Both Healix companies have been featured in "FiercePharma," a publication covering news from and for the pharmaceutical industry.

The Defendant Healix argues that there is no overlap in the advertising channels because it does not market or advertise its services to pharmaceutical companies. According to Jeffrey Erb, President of Healix Global, the company "does not actively advertise its services. Healix Global does not need to advertise, because very few companies provide media services, and Healix Global's potential clients already know about Healix Global. Like any business, Healix Global has a website and social media presence, but Healix Global does not consider this advertising." (Docket Entry No. 73-4 at ¶ 10). The Defendant Healix cites *American Century Proprietary Holdings v. American Century Casualty Co.*, 295 Fed. App'x 630, 637 (5th Cir. 2008), but in that case, there was no evidence that the defendant advertised at all; it did not even operate a website. The Defendant Healix, on the other hand, operates several social-media sites and regularly appears at trade shows and conferences.

Generally, the fact that two companies use the internet as part of their communications and advertising is insufficient by itself to show overlapping marketing channels. *Ultimate Living Int'l, Inc. v. Miracle Greens Supplements, Inc.*, No. 3:05-cv-1745-M, 2007 U.S. Dist. LEXIS 102, at *12 (N.D. Tex. Jan. 3, 2007) (some use of internet advertising alone does not show overlapping marketing channels); *Dallas Cowboys Football Club, Ltd. v. Am.'s Teams Props.*, 616 F. Supp. 2d 622, 639 (N.D. Tex. 2009) ("'The Internet' is simply too broad to assert complete overlap of retail outlets; it is akin to saying 'stores' or 'distributors.' Nevertheless, it is indicative of at least some

overlap."). While the Defendant Healix may rely primarily on word-of-mouth referrals, on the present record it is difficult to say that the combination of internet sites and appearing in publications and at trade shows are not "advertising" or "marketing." In conjunction with similar marks and overlap in consumers, the use of the internet to advertise is relevant. *Ultimate Living*, 2007 U.S. Dist. LEXIS 102, at *12 ("However, the similarity of the product names and the virtual identity of the consumers contributes to potential Internet confusion. Therefore, the fourth and fifth digits weigh, if only slightly, in [the plaintiff's] favor.").

The Defendant Healix also focuses on the differing content of the "advertising" the two Healixes use. This argument appears misplaced under this digit. The relevant inquiry is whether the parties used the same retail outlets and target the same purchasers or clients. The content of the advertising is more appropriately considered under the similarity-of-services digit.

Because this factor is also subject to factual disputes or conflicting inferences, it weighs in favor of denying summary judgment.

### 6.      The Defendant's Intent

"Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement." *Oreck*, 803 F.2d at 173. "If, however, a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *Exxon Corp.*, 628 F.2d at 506 (quoting RESTATEMENT OF TORTS § 729, cmt. f (1938)). Use in the face of knowledge of a prior user's mark is generally not enough to infer bad faith. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1159  n.7 (5th Cir. 1982). Nor is there anything "sinister in a situation where a firm believes that it has a right to use a mark similar

to one already in use because in its view no conflict exists since there are differences . . . ." 4 MCCARTHY § 23:124.  "If the defendant acted in good faith, then this digit becomes a non-factor in the likelihood-of-confusion analysis."  *Elvis Presley Enters.*, 141 F.3d at 203.

The Plaintiff Healix argues that the Defendant Healix used the mark despite knowing about the Plaintiff's registration and prior use.  (Docket Entry No. 78-12 at 9).  The Defendant Healix's attorney testified that she did not fully investigate the Plaintiff's use of the mark, but instead viewed the Plaintiff's website and determined that the services were not the same.  (*Id.* at 11).  There is no written legal opinion or analysis showing reliance on the advice of counsel.  The Plaintiff Healix also argues that the Defendant has continued to use the mark despite receiving a cease and desist letter, the complaint in this case, and the evidence of prior registration and use.

The Defendant Healix argues that there is no proof of intent to infringe because it adopted the name "Healix" in good faith, based on the advice of counsel.  The Defendant Healix is correct that "mere knowledge" of a plaintiff's mark is insufficient to establish bad intent.  Evidence of intent to capitalize on the plaintiff's popularity or good will is required.  *See Streamline*, 851 F.3d at 456. The courts in the cases the Defendant Healix cites do not determine lack of intent solely based on asserted reliance on the advice of counsel.  *See, e.g.*, *Grand Time Corp. v. Watch Factory Corp.*, 2011 U.S. Dist. LEXIS 62533, at *13 (N.D. Tex. June 10, 2011) ("Watch Factory filed for trademark protection shortly after Grand Time in 2007, sought advice of counsel on legal ownership of the trademark several times, and stopped selling 'Just Bling' watches pending the outcome of this case."); *Kensington Partners v. Cordillera Ranch, Ltd.*, 1998 U.S. Dist. LEXIS 23673 (W.D. Tex. June 16, 1998) (intent was not shown by the defendant's prior knowledge of the plaintiff's mark or evidence that the defendant would have reconsidered using the mark if there was confusion and

obtained a legal opinion that he could adopt the mark).

There is insufficient evidence in the present record to conclude as a matter of law that the Defendant Healix adopted the mark with the intent to derive benefit from the Plaintiff's prior use. Contrary to the Defendant Healix's argument, this digit does not "weigh[] heavily against a likelihood of confusion"; it is instead a "non-factor." *Elvis Presley Enters.*, 141 F.3d at 203. This digit is neutral.

### 7. Actual Confusion

"Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *Amstar Corp.*, 615 F.2d at 263 (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975)). A plaintiff may show actual confusion through anecdotal instances of consumer confusion, or through systematic consumer surveys, or both. *Compare Moore Bus. Forms Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir. 1992) *with Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 486 (2004) (citations omitted). "The relevant inquiry is whether use of the mark produces confusion in potential customers." *Citizens Nat. Bank of Meridian v. Citizens Bank of Phila. Miss.*, 35 F. App'x 391 (5th Cir. 2002) (citing *Roto-Rooter*, 513 F.2d at 46 (considering testimony of persons who had mistakenly employed defendants while intending to employ plaintiffs)).

Evidence of confusion may come from consumers or from other sources, but "not all confusion counts: evidence of actual confusion must show 'more than a fleeting mix-up of names'; rather it must show that '[t]he confusion was caused by the trademarks employed and it swayed consumer purchases.'" *Streamline*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 230)); *Soc'y of Fin. Exam'rs Nat'l Ass'n of Certified Fraud Exam'rs Inc.*, 41 F.3d 223, 228 n.11 (5th Cir.

1995) ("The plaintiff need not, however, prove confusion in actual consumers." (citing *Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) (error to discount evidence of actually confused distributors and trade-show visitors)); *Fuji Photo Film Co.*, 754 F.2d at 597 (5th Cir. 1985) ("In no case have we sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view, regardless of the identity of the person confused."); *see also New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 U.S. Dist. LEXIS 41192, at *23 (S.D. Tex. Oct. 4, 2005) ("Thus, a plaintiff 'need not prove confusion on the part of actual customers . . . because 'evidence of confusion in others permits the inference of confusion of purchasers." (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 221 (5th Cir. 1985) and *Soc'y of Fin. Exam'rs*, 41 F.3d at 228, n.11) (proof of confusion in consumers is more probative than proof of confusion in others). The Defendant Healix argues that the "only relevant evidence of actual confusion" is from potential customers. Although the evidence of confusion among noncustomers may be less probative, it is relevant.

"'[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.'" *Xtreme Lashes*, 576 F.3d at 221 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)). "[C]ourts may not ignore competent evidence of actual confusion." *Xtreme Lashes*, 576 F.3d at 230 (finding that evidence of confusion created a genuine issue of material fact), and, as noted, the evidence of actual confusion need not be solely from potential customers.

The Plaintiff Healix cites several instances of actual confusion, as follows:

• the job posting website, Glassdoor, confused the parties' company information, logos, and job postings, (Docket Entry Nos. 74-5 at 70–75, Docket Entry No. 74-

38

25–74-28);

- "Indeed," another job posting site, mixed up the Healix companies' listings, (Docket Entry NO. 74-38);

- the Plaintiff Healix's CFO Gallegos received an email from a job recruiter offering his services to fill a vice-president position with the Defendant Healix, not the Plaintiff, (Docket Entry No. 75-2 at ¶ 2);

- CFO Gallegos subsequently received a LinkedIn message from a prospective candidate expressing interest in the same vice-president position with the Defendant Healix, (*Id.* at ¶ 3); and

- the Defendant Healix received an email from Bristol-Myers Squibb asking whether the vendor number for HEALIX SCIENTICS in Houston could be used as the name and ID for the Defendant Healix, (Docket Entry No. 74-30).

The Defendant Healix characterizes these instances as "fleeting mix-ups of names by irrelevant non-consumers." (Docket Entry No. 77 at 8). The Defendant argues that the "absence of, or minimal, actual confusion . . . over an extended period of time of concurrent sales weighs against a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 204. The Defendant also argues that the Bristol-Myers email was taken out of context and that another Bristol-Myers employee responded to the email six hours after it was sent to clarify that the two Healixes were unrelated.

The Fifth Circuit cases require that the "confusion result from the mark, rather than a 'fleeting mix-up of names.'" *Streamline*, 851 F.3d at 457. In *Streamline*, the Fifth Circuit rejected the defendant's argument that the evidence of actual confusion was "innocuous and isolated" because the relevant standard requires "very little proof" of actual confusion and can be supported by testimony of one incident. The Plaintiff Healix has presented some evidence of actual confusion. The evidence cannot be disregarded or deemed "irrelevant" because it shows the confusion of noncustomers. *Fuji Film*, 754 F.2d at 597. Although this evidence may not weigh as heavily as

39

evidence of confusion by customers that affected purchases, it is a factor in favor of finding a likelihood of confusion.

The Defendant Healix argues that it has provided affirmative evidence that actual customers are not confused. The Defendant presents an affidavit from the head of Marketing and Sales at Teva, a shared client for marketing services. (Docket Entry No. 73-63). The affiant, Khalil Sayed, has never worked with the Plaintiff Healix and knows of it only by visiting its website. The Plaintiff Healix disputes this evidence, arguing that the affiant is an individual already doing business with the Defendant Healix and not someone that both parties deal with. The Plaintiff cites *Oleg Cassini, Inc. v. Cassini Tailors, Inc.*, 764 F. Supp. 1104, 1112 (W.D. Tex. 1990), in which the court found that affidavits from individuals who were not confused were not helpful and did "not convince the Court that other consumers will not be confused when other factors suggest a confusing similarity between the names, products, and customers of the two entities involved." The Defendant Healix distinguishes this case as involving actual consumer confusion and argues that the most analogous case is *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 798 (N.D. Tex. 2012). In *Crane*, the defendants produced affidavits from four purchasers representing four companies, all stating that they had not been confused and that no other purchaser could be confused. The *Crane* court rejected the plaintiff's objection that the affidavits should be discounted because they were made by long-time business acquaintances of the defendant, emphasizing that the plaintiff had not presented any evidence of actual confusion. However, the court also found that this factor was neutral. 861 F. Supp. 2d at 798.

The Defendant Healix argues that there is no evidence of actual confusion. While actual confusion is "the best evidence" of actual confusion, the Plaintiff Healix need not show actual

confusion to raise a factual dispute as to a likelihood of future confusion. The digits-of-confusion analysis is not into whether actual confusion has occurred, but whether confusion is likely. The fact that no actual confusion has occurred does not conclusively establish that future confusion is unlikely. When a plaintiff presents no evidence of actual confusion, the digit is at best neutral.

The Plaintiff Healix has produced some evidence of confusion, although it is not from a customer. The weight ultimately given to the Plaintiff's evidence of confusion among nonconsumers may be slight, and the weight given to the Defendant's evidence of an absence of confusion may be great, but that weighing of disputed facts and conflicting inferences cannot be done on cross-motions for summary judgment.

### 8.    The Degree of Care Exercised by Potential Purchasers

The Defendant Healix argues that its clients are highly sophisticated corporations. "[C]onfusion is more likely . . . if the products in question are 'impulse' items or are inexpensive." *Falcon Rice Mill, Inc.*, 725 F.2d at 345 n.9 (rice); *see also Smack Apparel*, 550 F.3d at 483 (t-shirts). In contrast, "a person buying a 'big ticket' item . . . would ordinarily be expected to be a more careful buyer than the impulse purchaser or the purchaser of a relatively inexpensive item." *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 n.10 (5th Cir. 1979); *see also Streamline*, 851 F.3d at 458 (explaining that the cost of the item can determine the degree of care).

In *Oreck*, the Fifth Circuit overturned a jury verdict finding infringement in part because the ultimate purchasers of the defendant's carpet-cleaning products were "people who are directly responsible for . . . buying for professional and institutional purposes at a cost in the thousands of dollars" and "virtually certain to be informed, deliberative buyers." 803 F.2d at 173 (citing *Sun-Fun Prods. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 191 (5th Cir. 1981); *Armstrong Cork*, 597

F.2d at 504 n.10).  In *RE/MAX International*, the court found that, by contrast, "the typical client of a real estate brokerage agency is not an expert in the purchase and sale of real estate or in real estate franchise relationships."  655 F. Supp. 2d at 708.  Instead, "the ordinary consumer of real estate brokerage services . . . is likely to be a 'typical buyer exercising ordinary caution.'"  *Id.* at 707 (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir.1991)); *see also Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) ("The standard to be employed is the ordinary purchaser, not the expert.") (citations omitted); *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999) (the standard is the "reasonably prudent consumer").

This digit weighs in favor of the Defendant Healix. The Plaintiff Healix argues that the "industry professionals . . . vary in sophistication and experience" and that even sophisticated consumers can be confused.  (Docket Entry No. 72-1 at 28).  The Defendant Healix argues that both companies' consumers are highly sophisticated, careful consumers.  (Docket Entry No. 73-8 at 37; Docket Entry No. 73-26 at 37, testimony describing due diligence that the Plaintiff Healix's customers engage in before  making purchases).  The Defendant emphasizes that the lengthy "request for proposal" process that its potential and existing clients go through to purchase services from the Defendant Healix makes the clients very informed.

While the Plaintiff Healix is correct that sophisticated consumers can initially be confused, *see, e.g.*, *John Crane*, 861 F. Supp. 2d at 799, the customer base for both parties is sophisticated. This digit weighs against finding a likelihood of confusion.

### C.    Balancing the Digits

The balance of the digits is hard to determine when there are genuine factual disputes or

conflicting inferences material to determining how similar the services and client bases of the two Healixes are. The evidence is disputed and conflicting. Other than the sophistication of the clientele (digit 8), none of the digits clearly weighs in favor of finding no likelihood of confusion. Digits 1 and 2—the strength of the mark and the similarity of the marks—weigh in favor of finding a likelihood of confusion. Digit 6, the Defendant's intent, is at best neutral. Digit 7, actual confusion, is either neutral or slightly in favor of the Plaintiff Healix. Given this record, both summary judgment motions are denied, without prejudice to the parties reasserting the same arguments based on a fuller record and when credibility judgments and findings on factual disputes and conflicting inferences are properly made.

## IV.    Conclusion

This case is unusual in that the similarity of services applies to only one part of the markholder's company, and the two companies are otherwise clearly different and distinguishable. That makes the denial of the Defendant Healix's motion a close question. But the disputed evidence and conflicting inferences as to whether a likelihood of confusion is shown requires a factfinder to determine the digits of confusion and to balance the factors. That cannot properly be done on this summary judgment record.

The cross-motions for summary judgment, (Docket Entry Nos. 72, 73), are denied.

SIGNED on April 16, 2018, at Houston, Texas.

_____
                    Lee H. Rosenthal
              Chief United States District Judge